UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SCOTT POOL, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:23-cv-00631-JMS-MKK |
| | ) | |
| THE LILLY SEVERANCE PAY PLAN and | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| *Defendants*. | ) | |

## **ORDER**

Plaintiff Scott Pool sued Defendants Eli Lilly and Company ("Lilly") and The Lilly Severance Pay Plan ("the Plan") alleging that they have refused to pay him the full amount under the terms of the Plan in violation § 502(a)(1)(B) of the Employee Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(1)(B), and that Defendants have breached fiduciary duties owed under ERISA. Defendants have filed a Motion for Summary Judgment, [Filing No. 36], which is now ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of*

*Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following Statement of Facts is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. The Plan

Lilly established the Plan "to provide severance benefits to certain employees . . . in the event that their employment is terminated" under certain circumstances outlined in the Plan. [Filing No. 37-2 at 4.] Lilly's Employee Benefits Committee is the administrator and fiduciary of the Plan and has the authority to interpret the Plan and "to decide any and all matters arising thereunder, including the right to remedy possible ambiguities, inconsistencies or omissions." [Filing No. 37-1 at 10.]

### B. Mr. Pool's Employment with Lilly

Mr. Pool was first hired by Lilly in 2001. [Filing No. 37-6 at 3.] In January 2014, Mr. Pool left his employment with Lilly, but he returned to work at Lilly in October 2014. [Filing No. 37-3 at 10; Filing No. 37-6 at 3.] In November 2021, Mr. Pool's employment with Lilly was terminated. [Filing No. 37-5 at 54.]

### C.  The Severance Agreement and Release of Claims

On December 29, 2021, Mr. Pool signed a Severance Agreement and Release of Claims ("Severance Agreement").  [Filing No. 37-5 at 17-27.]  The Severance Agreement provided that Mr. Pool would "receive a Severance Benefit from Lilly as set forth in the Plan," and in exchange, would be giving up certain claims against Lilly.  [Filing No. 37-5 at 19.]  "Severance Benefit" is defined in the Severance Agreement as "the severance described in Subsection 3.02(a) of the Plan," and "Plan," in turn, is defined as the Lilly Severance Pay Plan.  [Filing No. 37-5 at 17.]  Thus, the Severance Agreement references and incorporates the Plan.  [*See* Filing No. 37-5 at 17; Filing No. 37-5 at 19.]

The Severance Benefit, as described in Subsection 3.02(a) of the Plan and referenced in the Severance Agreement, provides, in relevant part:

> An Employee who satisfies the eligibility requirements in subsection 3.01 will be entitled to a Severance Benefit as described in this subsection 3.02. Subject to the provisions of paragraphs 3.02(b) and 3.02(d), the Severance Benefit (which will include, if applicable, the Additional Severance Payment described below), shall be equal to the following: the greater of (i) twelve times an Employee's Weekly Compensation; or (ii) eight times an Employee's Weekly Compensation plus an additional two times an Employee's Weekly Compensation for each Year of Service completed by the Employee, but not to exceed seventy-eight times an Employee's Weekly Compensation.
>
> By way of illustration only, an Eligible Employee with ten years of Service would receive eight times an Employee's Weekly Compensation plus an additional twenty times an Employee's Weekly Compensation (8 + (2*10)) times Weekly Compensation or twenty-eight times his Weekly Compensation.

[Filing No. 37-2 at 8.]

Subsection 2.01 of the Plan provides definitions for terms and phrases used in the Plan.  [Filing No. 37-2 at 5-7.]  "Service," which is a term used in the above-quoted definition of Severance Benefit, is defined in the Plan as:

> [T]he period of an Employee's continuous employment . . . measured from the date on which the Employee is first employed . . . to the date on which the Employee's employment . . . terminates. . . .
>
> If an Employee terminates employment . . . and is subsequently re-employed . . . following an interruption in service, "Service" shall include only the Employee's period of continuous employment after the date on which the Employee was re-employed . . . . "Service" for such an Employee shall not include the Employee's period of continuous employment . . . prior to the date on which the Employee was re-employed . . . .

[Filing No. 37-2 at 6.]

### D.  Mr. Pool's Severance Benefits

While working at Lilly, Mr. Pool made $150,058 per year, or $2,885.73 per week.  [Filing No. 37-5 at 60-61.]  Lilly paid Mr. Pool $68,486.08 in severance benefits based on his continuous service following his re-employment from October 2014 until November 2021.  [Filing No. 37-3 at 5; Filing No. 37-5 at 60-61.]  In other words, Lilly did not consider Mr. Pool's first period of employment (from 2001 to January 2014) when calculating his severance benefits.  [*See* Filing No. 37-3 at 5; Filing No. 37-5 at 60-61.]

After Mr. Pool received his severance benefits in January 2022, he emailed Lilly's Human Resources Department to let them know that he was missing "a significant amount" of his severance benefits under the Severance Agreement.  [Filing No. 37-3 at 10.]  He explained:

> I am missing a significant amount . . . maybe around $40K or so, and I am hoping you can help me clear this up.  I was originally hired by Lilly in 2001 and left for a short time in the middle and was rehired in 2014.  I currently have 19.75 years of continuous service according to Lilly Retirement.  I can only surmise that either payroll calculated the severance payout from 2014 and left off my earlier years of service OR you charged me the almost $43,000 that I owed you for a move made in 2019 but was forgiven when I signed the severance agreement.  Either way, there is a significant amount missing on that deposit.
>
> I would ask that you please kindly look into this discrepancy as soon as possible and also can you please send me a copy of the actual pay slip, as I have no record of the transaction.

[Filing No. 37-3 at 10.]

In response, a Lilly Human Resources representative explained that for employees who left Lilly and were subsequently re-employed, "the date used to calculate the severance payout is based on the most recent hire (rehire) date. . . . [which] was 10/6/2014.  The date used for your severance payout calculation was 10/6/2014 which aligns with our Plan.  Your severance payout is correct." [Filing No. 37-3 at 9.]  The Lilly Human Resources representative also sent a screenshot from the Plan that defines "years of Service" for an employee who terminated his employment with Lilly and was subsequently rehired as "only that period of continuous employment following the date of reemployment."  [Filing No. 37-3 at 9.]

Mr. Pool responded that "this [was] VERY surprising information" and asked where that definition was located because it was not in the Severance Agreement and he did not find it online. [Filing No. 37-3 at 9 (emphasis in original).]  The Lilly Human Resources representative explained that the information came from page 217 the Lilly Employee Handbook, also known as the Company Plan, which contains "Lilly's policies and procedures, code of conduct, benefits, etc." [Filing No. 37-3 at 6-8.]

**E.  Mr. Pool Hires Counsel and Appeals His Severance Calculation**

Mr. Pool retained counsel to represent him regarding his severance calculation and on March 24, 2022, Mr. Pool formally appealed his severance calculation with Lilly.  [Filing No. 37-3 at 4.]  Lilly responded on April 5, 2022, by sending Mr. Pool a form to submit to the Employee Benefits Committee to review his claim for a greater severance benefit.  [Filing No. 37-4 at 4-5.]

Mr. Pool completed the form for the Employee Benefits Committee on June 6, 2022, and argued that he was still owed $68,533.15 in severance because "nowhere in the [Severance Agreement] does it mention" that "years of Service" includes "only that period of continuous

employment following the date of reemployment" nor is that how the Severance Agreement defines "Severance Benefit." [Filing No. 37-5 at 3.] He also argued that the Employee Handbook "was never attached to the [Severance Agreement] or handed out to [him] with the [Severance Agreement]." [Filing No. 37-5 at 3.]

**F.  The Employee Benefits Committee Denies Mr. Pool's Appeal**

Lilly's Employee Benefits Committee met in July 2022 and discussed Mr. Pool's appeal/request for additional severance. [Filing No. 37-8 at 2-3.] Minutes from the meeting state:

> The [Employee Benefits] Committee reviewed the information provide by [Mr. Pool] and other relevant [Plan] information. Based on its review of the materials presented and the applicable terms of the [Plan], the [Employee Benefits] Committee concluded that the calculation of severance benefits provided to [Mr. Pool] was consistent with the terms of the [Plan]. As a result, the Committee denied the request for additional severance consistent with the terms of the [Plan].

[Filing No. 37-8 at 2-3.] The Employee Benefits Committee therefore affirmed the payment as made and denied Mr. Pool's request. [Filing No. 37-8 at 2-3.]

On July 28, 2022, the Employee Benefits Committee informed Mr. Pool of its decision. [Filing No. 37-9 at 2-3.] The letter quoted specific language from the Plan and explained that, since the Plan's definition of "Service" includes only years of continuous employment after the date of reemployment, he was not eligible for additional severance benefits as requested. [Filing No. 37-9 at 2-3.]

**G.  This Lawsuit**

In April 2023, Mr. Pool initiated this lawsuit, contending that his severance payment should have considered his first period of employment with Lilly. [Filing No. 1.] He asserts that Defendants' actions constitute a violation of § 502(a)(1)(B) of ERISA and a breach of fiduciary duties owed under ERISA. [Filing No. 1.]

**III.**

**D**ISCUSSION

**A.  Claim for Violation of § 502(a)(1)(B) of ERISA**

Defendants argue that Mr. Pool's claim under § 502(a)(1)(B) of ERISA fails "because the [Employee Benefits Committee's] determination is a reasonable interpretation of the [Plan's] clear and unambiguous terms and is supported by a reasonable explanation of the evidence." [Filing No. 38 at 7.] They contend that Mr. Pool "fail[s] to appreciate that [his Severance Agreement] is expressly governed by the [Plan] provisions that define the years of service to be included in the calculation to be only those following his re-employment in 2014." [Filing No. 38 at 7.] They argue that the Employee Benefits Committee based its decision on the undisputed evidence that Mr. Pool left his employment with Lilly in 2014 and then later returned. [Filing No. 38 at 9.] As such, they assert that the Employee Benefits Committee applied the clear language of the Plan to the undisputed evidence, and that its decision was neither arbitrary nor capricious, so Defendants are entitled to summary judgment. [Filing No. 38 at 8-10.]

In response, Mr. Pool argues that the Employee Benefits Committee's decision was arbitrary and capricious because the term "Service" was not defined in the Severance Agreement or in Subsection 3.02(b) of the Plan. [Filing No. 39 at 9.] He asserts that because the term was not defined in the Severance Agreement and Defendants did not inform him that "Service" was defined differently for purposes of severance pay versus retirement benefits,[1] Defendants hid a material term from Mr. Pool. [Filing No. 39 at 10.] He further argues that the Employee Benefits Committee's decision "runs counter to the evidence" because the Lilly Employee

---

[1] It appears that, for purposes of retirement benefits, Lilly uses total cumulative years of service, gaps in employment notwithstanding. [*See* Filing No. 37-3 at 10.]

Handbook/Company Plan "was omitted from inclusion within the [Severance Agreement]." [Filing No. 39 at 11.]

In reply, Defendants argue that the definition of "Service" from the Plan was explicitly incorporated by reference into the Severance Agreement, which defines "Severance Benefit" by reference to the Plan and further stated that Mr. Pool's benefit would be provided "as set forth in the [Plan]." [Filing No. 40 at 7 (citing Filing No. 37-5 at 19.] They assert that such incorporation by reference "fully align[s] with Seventh Circuit precedent." [Filing No. 40 at 8.] Defendants contend that Mr. Pool has not shown that the Employee Benefits Committee's interpretation of the Severance Agreement and Plan documents, and their resulting decision, "which is entitled to deference, was 'downright unreasonable.'" [Filing No. 40 at 10.]

Under ERISA, when "a plan grants discretion to its administrator," the reviewing court reviews "the administrator's decision to deny benefits under the arbitrary-and-capricious standard."[2] *Estate of Jones v. Child.'s Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018) (citation omitted). This is a deferential standard, which is met as long as:

(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome,
(2) the decision is based on a reasonable explanation of relevant plan documents, or
(3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.

*Id.* (citation and quotation omitted). Put differently, "the reviewing court must ensure only that a plan administrator's decision has rational support in the record." *Id.* (citation omitted).

---

[2] The parties agree that the Plan grants discretion to its administrator, the Employee Benefits Committee, and that the arbitrary-and-capricious standard is the correct standard for the Court's review. [*See* Filing No. 38 at 5-6; Filing No. 39 at 7-8.]

The inquiry into a plan administrator's decision necessitates an inquiry into the language of the plan, the interpretation of which is governed by the general principles of contract law embedded in the federal common law. *Id.* "Plan language is therefore given its plain and ordinary meaning, and the plan must be read as a whole, considering separate provisions in light of one another and in the context of the entire agreement." *Id.* (citation and quotations omitted). Reading as a whole requires that all parts of the plan be given effect and includes reading related and incorporated documents together. *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783-84 (7th Cir. 2006) (citation omitted); *see also Chicago Dist. Council of Carpenters Pension Fund v. K&I Constr., Inc.*, 270 F.3d 1060, 1069 (7th Cir. 2001) ("The reasonableness of a proposed interpretation of contractual language requires consideration of the contract as a whole, including terms incorporated by reference."); *Carlson v. Northrop Grumman Corp.*, 2018 WL 1586241, at *1-4 (N.D. Ill. Apr. 2, 2018) (explaining that "courts have to identify the documents that constitute the [ERISA] plan," which may include looking into whether a particular document is incorporated, and finding that both the severance agreement and a document incorporated within the severance agreement that set the specifics of the severance benefits and eligibility criteria constituted the "plan"). If an administrator's decision "defies a plan's plain language," the decision is arbitrary and capricious. *Id.* (citation omitted).

Looking at the plain and ordinary meaning of the Severance Agreement and reading it alongside the incorporated Plan, it is clear that the Employee Benefits Committee's decision "has rational support in the record" and is therefore not arbitrary or capricious. *Estate of Jones*, 892 F.3d at 923 (citation omitted). To start, the Severance Agreement provides, "I will receive a Severance Benefit from Lilly as set forth in the Plan if I sign [the Severance Agreement]." [Filing No. 37-5 at 19; *see* Filing No. 37-5 at 17 (defining "Plan" as the Severance Pay Plan).] The

Severance Agreement further defines "Severance Benefit" as "the severance described in Subsection 3.02(a) of the Plan." [Filing No. 37-5 at 17.] This language clearly and unambiguously references the Plan for further details regarding severance benefits, which necessitates that the Severance Agreement and Plan be read together. *See Estate of Jones*, 892 F.3d at 923 ("[T]he plan must be read as a whole, considering separate provisions in light of one another and in the context of the entire agreement") (citation omitted); *Bland*, 401 F.3d at 783-84 ("[A] document should be read as a whole with all its parts given effect, and related documents must be read together.") (citation omitted); *Carlson*, 2018 WL 1586241, at *1-4 (same principle).

Turning to the Plan, it explicitly uses the defined term "Service" in Subsection 3.02(a) and addresses the situation where an employee leaves Lilly and is subsequently reemployed by Lilly. [Filing No. 37-2 at 6.] When this occurs, the Plan explains that "'Service' shall include only the Employee's period of continuous employment after the date on which the Employee was re-employed." [Filing No. 37-2 at 6.]

Consistent with this language, the Employee Benefits Committee determined that Mr. Pool's "Service" constituted his second period of employment, beginning on October 5, 2014 and ending upon his termination on November 16, 2021, resulting in $68,486.08 in severance benefits. [Filing No. 37-9.] The decision is based on a straightforward application of the definition of "Service" to Mr. Pool's re-employment with Lilly. Accordingly, the decision is based on "a reasonable explanation of the relevant plan documents"—the Severance Agreement and the Plan— and was not arbitrary or capricious. *Estate of Jones*, 892 F.3d at 923.

Mr. Pool's argument regarding the location of the "Service" definition is not convincing because the Plan must be read as a whole in the context of the entire Severance Agreement—not with a granular focus on one subsection. *See id.*; *Bland*, 401 F.3d at 783-84. Likewise

11

unconvincing is Mr. Pool's argument that Defendants "with[held] material information." Material information is not "withheld" due to a party's failure to fully read a document that was explicitly incorporated into the agreement. Further, the Employee Benefits Committee's decision is not counter to the evidence as Mr. Pool suggests. It is undisputed that Mr. Pool left Lilly for several months and was rehired, and there is evidence that before signing the Severance Agreement, Mr. Pool was told to review the Plan to calculate his severance payout. [Filing No. 37-3 at 6; Filing No. 37-6 at 4 ("[Mr. Pool] was informed prior to his exit to review the policy regarding his severance payouts.").] As unfortunate as it may be, the question is not whether Mr. Pool had actually reviewed the policies set forth in the documents regarding his severance payout. The question before the Court is whether the "administrator's decision has rational support in the record," and it does because "the decision [was] based on a reasonable explanation of relevant plan documents." *Estate of Jones*, 892 F.3d at 923. Defendants' Motion for Summary Judgment, [Filing No. 36], is **GRANTED** as to Mr. Pool's claim that Defendants violated § 502(a)(1)(B) of ERISA.

### B. Breach of Fiduciary Duty Claim

Mr. Pool alleges that Defendants breached their fiduciary duties "by failing to pay [him] benefits pursuant to the terms of the [Plan], as stated in the [Severance Agreement]." [Filing No. 1 at 5.] To be sure, the Employee Benefits Committee, as a fiduciary, owed Mr. Pool "a duty to execute faithfully the terms of the [Plan] and to see that those entitled to benefits receive them." *Hennen v. Metro. Life. Ins. Co.*, 904 F.3d 532, 541 (7th Cir. 2018) (quotation and citation omitted). But as explained above, the Employee Benefits Committee did not fail to pay Mr. Pool pursuant to the terms of the Plan and the Severance Agreement. Therefore, his claim for breach of fiduciary

duty necessarily fails,[3] and Defendants' Motion for Summary Judgment, [Filing No. 36], is

**GRANTED** as to Mr. Pool's breach of fiduciary duty claim.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment, [36].  Final judgment shall enter accordingly.


Date: 2/29/2024

_[signature]_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF to all counsel of record**

---

[3] Despite only pleading that "Defendants breached their fiduciary duties owed under ERISA by failing to fully pay [Mr. Pool's] benefits . . . pursuant to the terms of the [Plan], as stated in the [Severance Agreement]," Mr. Pool now claims in his Response in Opposition to Defendants' Motion for Summary Judgment that Defendants breached their fiduciary duties by failing to inform him of the definition of "Service" in the Plan.  [Filing No. 1 at 5; Filing No. 39 at 15.]  However, the "summary judgment stage 'is too late in the day to be adding new claims.'"  *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 860 (N.D. Ill. Jan. 2013) (quoting *Zeidler v. A & W Restaurants, Inc.*, 219 F. App'x 495, 499 (7th Cir. 2007)).  "A plaintiff cannot advance new arguments in response to a motion for summary judgment when no such claims were raised prior to summary judgment." *Sistrunk*, 931 F. Supp. 2d at 860; *Outlaw v. Regis Corp.*, 525 F. App'x 501, 503 (7th Cir. 2013) (holding that plaintiff's "new claim first raised in opposition to a motion for summary judgment" need not be considered by the Court).